IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.:  5:17-cv-00534-H

EPIC GAMES, INC.,

             Plaintiffs,

v.

C.R.,

             Defendant.

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR DEFAULT JUDGMENT**

     The Court should grant the Motion for Default Judgment filed by Plaintiff Epic Games, Inc. ("Plaintiff" or "Epic") against Defendant C.R. ("C.R." or "Defendant") because the Clerk of Court entered default against C.R. after he failed to file an answer to the Complaint, failed to comply with the Court's July 12, 2018 order (D.E. 22), and because Epic has otherwise complied with all of the requirements of Rule 55(b).  Accordingly, Epic submits this Memorandum of Law, the Second Declaration of Christopher M. Thomas, and the Affidavit of Christopher M. Thomas in Support of Motion for Default Judgment, and respectfully requests that the Court grant its Motion for Default Judgment against Defendant for the reasons provided below.

## I.  STATEMENT OF FACTS

### A.  Background on Epic and Fortnite

     Epic, founded in 1991, is a Cary, North Carolina-based developer and publisher of computer games, and computer game engine and content creation software.  (D.E. 1 at ¶ 13.)

Case 5:17-cv-00534-H   Document 26   Filed 09/24/18   Page 1 of 23

Epic first released its co-op survival and building action game, Fortnite®[1], on a limited basis in October 2013.  (*Id.* at ¶¶ 14-16.)  Fortnite was released more widely in July 2017 and its free-to-play "Battle Royale" game mode was released in September 2017.  (*Id.* at ¶ 17.)  Fortnite's popularity has grown steadily ever since and has become Epic's most popular game yet. (*See id.* at ¶¶ 18-19; *see also* Second Decl. of Thomas at ¶ 3.)  In designing Fortnite, Epic made a conscious choice <u>not</u> to sell items to players that would give any player a competitive advantage to ensure a fair playing field for all players.  (D.E. 1 at ¶ 20.)

Epic is the author and owner of all rights, title, and interest in the copyrights in Fortnite, including without limitation, Fortnite's underlying computer software and the audio visual works created by the software. (*Id.* at ¶ 21.) Epic's copyrights in various versions of Fortnite's computer code are the subjects of U.S. Copyright Registration Nos. TXu01-895-864 (dated December 18, 2013), TX008-186-254 (dated July 14, 2015), TX008-254-659 (dated March 3, 2016), and TX008-352-178 (dated December 23, 2016).  (*Id.* at ¶ 22, *id.* at Exh. A, [D.E. 1-1].)

### B.    Epic's Terms of Service and End-User Licensing Agreement

To use Epic's services, such as playing Fortnite on PC—which is the platform C.R. uses to play (and cheat at) Fortnite—a user must create an account with Epic.  (*Id.* at ¶¶ 23-28.)  In so doing, a user affirmatively acknowledges that he or she has "read and agree[d] to the Terms of Service" ("Terms").  (*Id.*, at Exh. B [D.E. 1-2].)  Because C.R. has been using Epic's services, he necessarily agreed to abide by the Terms.  (*Id.* at ¶¶ 23-37.)  Further, C.R. has been banned from using Epic's services at least 14 times for cheating.  (*Id.* at ¶ 75.)  Therefore, C.R. created at least 15 user accounts and, each time, affirmatively acknowledged acceptance of the Terms.  (*See  id.* at ¶ 35.)

---

[1] Fortnite is a registered trademark of Epic and is shown with the federal registration symbol the first time the trademark appears herein and without it thereafter.

The Terms include an "Intellectually Property Rights" section which sets forth the permissions users have with respect to Epic's intellectual property and activities that are prohibited. (*Id.* at ¶¶ 33-34.) The prohibited activities are set out in Paragraph 33 of the Complaint and include a prohibition against "copy[ing], modify[ing], creat[ing] derivative works of, publicly display[ing], publicly perform[ing,], republish[ing], or transmit[ting] any of the material obtained through [Epic's s]ervices." (*Id.* at ¶ 33.) The Terms also include a prohibition against using Epic's services for unlawful purposes. (*Id.* at ¶ 34.) Further, the Terms include a forum selection clause identifying federal courts in this District as the location for a lawsuit related to Fortnite. (*Id.* at ¶¶ 29-30.)

In order to play Fortnite on PC, a user must also acknowledge that he or she has read and agreed to abide by the terms in the Fortnite End-User License Agreement for PC (the "EULA"). (*Id.* at ¶¶ 38-40, *id.* at Exh. C, [D.E. 1-3].) Thus, because C.R. played Fortnite, he necessarily agreed to abide by the EULA. (*Id.* at ¶¶ 38-49.) Like the Terms, the EULA includes a section setting out prohibited activities. These prohibited activities include using Fortnite "commercially or for a promotional purpose;" copying, reproducing, distributing, displaying, or using Fortnite in a way that is not expressly authorized; reverse engineering, deriving source code from, modifying, adapting, translating, decompiling, or disassembling Fortnite, or making derivative works based on Fortnite; removing, disabling, circumventing, or modifying any proprietary notice of label or security technology included in Fortnite, or creating, developing, distributing, or using any unauthorized software programs to gain advantage in any online or other game modes. (*Id.* at ¶ 45.) Further, like the Terms, the EULA includes a forum selection clause identifying federal courts in this District as the proper forum for a lawsuit related to Fortnite. (*Id*. at ¶¶ 41-43.)

3

### C.     C.R.'s Infringing Activities

C.R. used cheat software ("cheats") while playing Fortnite to unlawfully modify Fortnite's software so that he had an unfair competitive advantage over other players. (*Id.* at ¶¶ 50-58.)  The cheat software works by injecting unauthorized code into Fortnite's copyrighted code, modifying and altering the copyrighted code, and creating an unauthorized derivative work of Epic's copyrighted Fortnite game, which infringes Epic's copyrights in the game. (*Id.* at ¶¶ 4, 70-72.)

In addition to cheating and creating unauthorized derivate works of Epic's Fortnite code and at all times relevant to the Complaint, Defendant demonstrated, advertised, and distributed his cheat software to the public on YouTube as he operated at least two YouTube channels under the monikers "Sky Orbit" and "Sky Orbit V2". (*Id.* at ¶¶ 58-59; *see* Second Decl. of Thomas at ¶¶ 7-8, Exhs. 2-3) (attaching screen prints of C.R.'s YouTube channels and noting that "Sky Orbit V2" appears to be unavailable as of the date of the filing of this Motion), (*id.* at ¶ 9, Exh. 4) (attaching a screen print of C.R.'s Twitter feed, which shows postings of links to Fortnite cheats).

On October 14, 2017, Defendant used the Sky Orbit channel to post a live stream video of himself cheating, while playing Fortnite, titled "FORTNITE HACKING (COME JOIN IM BACK)" (the "First Video").[2]  (*Id.* at ¶ 60.)  During the First Video, Defendant demonstrated his use of the cheat to unlawfully modify the Fortnite game code, instructed viewers as to how to use the cheat in the same way, and provided viewers with a link to a location from which they could acquire the cheat for their own use.  (*Id.* at ¶¶ 61-62; *id.* at Fig. 2, p. 13.)

On October 14, 2017, YouTube removed the First Video as a result of a Digital

---

[2] Errors in spelling, grammar, and punctuation that appear in this and other quotes from Defendant's writings are from the original text.

Millennium Copyright Act ("DMCA") takedown notice submitted by Epic. (*Id.* at ¶ 63.) After the First Video was removed, Defendant posted a video entitled "Epicgames Falsely striked my channel" (the "Second Video"). (*Id.* at ¶ 64.) In the Second Video, Defendant admitted to "hacking in Fortnite," incorrectly claimed that his hacking is permitted under the doctrine of fair use, and publicly disclosed the email address of one of Epic's in-house lawyers, in violation of YouTube's community guidelines. (*Id.*) Also on October 14, 2017, after the First Video had been taken down, Defendant used another of his YouTube channels, "Sky Orbit V2," to post another live stream of himself cheating while playing Fortnite, which he titled, "Fortnite Hacking COME JOIN MEEEE" (the "Third Video"). (*Id.* at ¶¶ 65-67; *id.* at Fig. 3, p. 13.) On October 14, 2017, YouTube removed the Third Video pursuant to a DMCA notice Epic submitted, and on October 16, 2017, YouTube removed the Second Video pursuant to a request submitted by Epic for violation of YouTube's community guidelines. (*Id.* at ¶¶ 65, 68-69.)

On October 17, 2017, Defendant submitted a counter-notification responding to Epic's DMCA takedown notice for the First Video in which he stated "i did noting rong this strike is all wrong I was modding in a video game that isn't against youtubes TOS Why was i striked !!!". (D.E. 1 at ¶ 76; *id.* at Exh. D [D.E. 1-4].) Pursuant to 17 U.S.C. § 512(g)(2), Epic had between ten and 14 days to file this action against C.R. seeking to restrain him from engaging in infringing activity or face the restoration of the infringing content by the Online Service Provider ("OSP"). 17 U.S.C. § 512(g)(2)(C).

### D. Epic's Service of the Complaint and C.R.'s Post-Filing Activity

The details of Epic's service of the Complaint are set out more fully in Epic's Declaration of Service and accompanying exhibits. (D.E. 10; *id.* at Exh. A-C, [D.E. 10-1, 10-2, 10-3].) On October 27, 2017, Epic sent the Civil Summons, Complaint, Rule 7.1 Financial Disclosures of Plaintiff Epic Games, Inc., and Notice of Appearance of Christopher M. Thomas to Defendant

via Federal Express at the Counter-Notification Address. (*Id.* at ¶ 3.) Epic received a Proof of Delivery Notification confirming that the aforementioned documents had been delivered. (*Id.* at Exh. A, [D.E.10-1].) On October 29, 2017, less than one week after the Complaint was filed, Defendant posted a now-unavailable video entitled "Epic Games is suing me…" on his Sky Orbit channel ("October 29 Video"). (*See* Second Decl. of Thomas at ¶ 10.) In this video, Defendant discusses the allegations made against him in the instant case and admits to cheating in Fortnite, to demonstrating the cheats in videos posted on his YouTube channel, and states that he is a minor. (*Id.*)

Epic became aware of the aforementioned video on or about the day it was posted and, in order to comply with all applicable rules, engaged the Office of the Sheriff of New Castle County of Wilmington, DE ("Office of the Sheriff") to personally serve C.R. and his mother with the above-referenced documents. (D.E. 10 at ¶ 8.) On November 9, 2017, Deputy Sheriff Joseph Meriggi ("Meriggi") attempted to serve C.R. at the Counter-Notification Address at 11:13am and at 1:00pm. (*Id.* at ¶¶ 9-10, *id.* at Exh. B, [D.E. 10-2].) The 11:13am attempt was unsuccessful, and during the 1:00pm attempt, Meriggi was informed by Adam Rogers (C.R.'s uncle) that C.R. is a juvenile who does not live at the Counter-Notification Address but, rather, lives with his mother, Lauren Rogers ("Ms. Rogers"). (*Id.*) Adam Rogers did not provide any further contact information to Meriggi. (*Id.*)

Meriggi executed an Affidavit of Non-Service on November 22, 2017 recounting the details of the attempted service of November 9, 2017. (D.E. 10 at ¶ 10, *id.* at Exh. B, [D.E. 10-2].) After receiving the Affidavit of Non-Service, Epic ran a report on Ms. Rogers, which listed a residential address ("Report Address") different from the Counter-Notification Address. (*Id.* at ¶ 11.) Epic then engaged S & H Investigative Services to confirm the location of C.R. and Ms.

Rogers, and, on or about January 5, 2018, S & H Investigative Services confirmed that the Report Address was the correct, current residence of Ms. Rogers and C.R. (*Id.* at ¶¶ 12-13.) Epic subsequently filed a proposed amended Summons with the Court containing the new information and naming both C.R. and Ms. Rogers, C.R.'s general guardian. (D.E. 8, *see also* D.E. 10 at ¶ 14).

On January 10, 2018, an amended Summons was issued. (D.E. 9.) On that same day, Epic engaged the Office of the Sheriff to personally serve all documents filed in this case on C.R. and Ms. Rogers. (D.E. 10 at ¶¶ 14-15.) On January 18, 2018, Epic received email confirmation from the Office of the Sheriff that service had properly been effected, and on January 22, 2018, Epic received executed, hardcopy affidavits of service and subsequently filed a Declaration of Service. (D.E. 10 at ¶¶ 16-19.)

### E. Ms. Rogers' *Ex Parte* Correspondence to the Court and C.R.'s Continued Unlawful Activity

On November 15, 2017, the Clerk of Court filed unsigned, undated, *ex parte* correspondence ("November 15 Letter") from C.R.'s mother, Ms. Rogers, on the docket. (D.E. 6). The November 15 Letter states that C.R. is a minor, discusses the contents of the Complaint, and concedes that C.R. cheated in Fortnite. (*Id.* at 1.) Epic filed a responsive letter on November 30, 2017 in which it stated that it did not know that Defendant was a minor when the Complaint was filed and asked for guidance as to whether the Court wanted the papers at issue sealed or redacted and re-filed. (D.E. 7 at 1-2.)

Epic moved for entry of default on February 13, 2018. (D.E. 11.) On April 3, 2018, the Court denied Epic's motion and "construe[d] the [November 15 Letter] as a motion to dismiss." (D.E. 13 at 2.) Epic submitted its response on April 23, 2018. (D.E. 17.)

On July 12, 2018, the Court denied Ms. Rogers' "letter construed as a motion to dismiss"

and ordered Defendant to file an answer to Epic's complaint "14 days from notice of [the] . . . order" and to file a proper notice of appearance in the case. (D.E. 22 at 5.) The Court further directed the Clerk to serve the order on Defendant, through his mother, at both the Report Address and the Counter-Notification Address. (*Id.*) The order was served on Defendant on July 12, 2018 (the "July 12 Order"). (D.E. 23 at ¶ 8.) Neither Defendant nor his Mother ever responded. Accordingly, Epic renewed its Motion for Entry of Default on August 9, 2018, and the Clerk of Court entered default against Defendant on September 10, 2018. (*See* D.E. 23, 24.)

Although he has not answered the complaint, Defendant *has* continued to engage in the sort of unlawful conduct described in it. For instance, an article published in Raleigh's *News & Observer* on August 7, 2018, describes a video Defendant broadcast on one of his YouTube channels ("Sky Orbit") in which he instructs his viewers to go to another of his channels ("Sky Orbit Fortnite"), which he described as a "backup channel," and to which he said he would upload "all of [his] 'Fortnite' cheating videos" because the first channel has two "copyright strikes" against it. (Second Decl. of Thomas at ¶ 11, Exh. 5.) As promised, on August 31, 2018, Defendant broadcast a live stream of himself cheating, the title of which is shown below.



FORTNITE AIMBOTTING LIVE? AGAIN NO FUCKING WAY
148 views • Streamed 1 week ago

(*Id.* at ¶¶ 11-12, Exhs. 5-6.) The video (recently removed in response to a DMCA takedown request submitted by Epic) featured Defendant using cheat software (referred to as an "aimbot") while streaming (i.e., live broadcasting) his gameplay. (*See id.* at ¶ 12, Exh. 6.) C.R. has also been "tweeting" (now inactive) links to Fortnite cheats using his Twitter account for at least the

last several months. (*See id.* at ¶ 9, Exh. 4.)

## II.     LAW AND ARGUMENT

Once default has been entered under Rule 55(a) of the Federal Rules of Civil Procedure, Federal Rule of Civil Procedure 55(b)(2) requires that a plaintiff apply to the court for a default judgment where the claim is not for a sum certain.  *Id*.  Rule 55(b)(2) authorizes the Court to enter default judgment against a properly served defendant who fails to file a timely responsive pleading.  *Id.*  Where the defendant is a minor, a court may enter default judgment "only if [the minor] is represented by a general guardian, conservator, or other like fiduciary who has appeared."  *Id.*

Although the entry of judgment by default by the Court is discretionary, it is warranted where the defaulting party has been properly served and has failed to plead or otherwise defend the action. *Music City Music v. Alfa Foods, Ltd*., 616 F. Supp. 1001, 1002 (E.D. Va. 1985). Upon default, the well-pleaded facts alleged in the complaint as to liability are deemed admitted. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001).  However, "a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover."  *Id.* (internal citations omitted).  A court must "determine whether the well-pleaded allegations in the plaintiff's complaint support the relief sought in the action." *DIRECTV, Inc. v. Pernites,* 200 F. App'x 257, 258 (4th Cir. 2006) (internal citations and quotations omitted).  That a defendant defaulted "does not in itself warrant the court in entering a default judgment.  There must be a sufficient basis in the pleadings for the judgment entered."  *Id.*

### A.     The Procedural Requirements of Entry of Default Judgment Have Been Met

The Court has subject matter jurisdiction over all the claims in the action.  The Court has subject matter jurisdiction over Epic's federal claims arising under the Copyright Act under 28

U.S.C. §§ 1331 and 1338(a). (D.E. 1 at ¶ 8); *see Sweepmasters Prof'l Chimney Servs., LLC v. Vanessa Servs.*, No. 1:16CV439, 2017 WL 3927626, at *2 (E.D. Va. July 5, 2017), *report and recommendation adopted*, No. 1:16-CV-439, 2017 WL 3927602 (E.D. Va. Sept. 7, 2017) (holding that the court had subject matter jurisdiction over the plaintiff's claims arising under the Copyright Act "because the dispute arises under the Copyright Act, as amended, 17 U.S.C. §§ 101 *et seq.*"). This Court also has subject matter jurisdiction over Epic's state law claims under 28 U.S.C. § 1367 because these claims are so related to federal claims in the action, over which this Court has such original jurisdiction, that they form part of the same case or controversy. (D.E. 1 at ¶ 8); *see Sweepmasters Prof'l Chimney Servs., LLC*, 2017 WL 3927626, at *2 (holding that the court had subject matter jurisdiction over the plaintiff's claims arising under state law "as plaintiff's claims are so relate to the claims within the Court's original jurisdiction that it is part of the same case or controversy").

Moreover, this Court also may properly exercise personal jurisdiction over C.R. because, by agreeing to Epic's Terms and EULA, C.R. agreed to be subject to the exercise of jurisdiction over him by the courts in this District. (D.E. 1 at ¶¶ 9, 29-30, 41-42); *see Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1022 (N.D. Cal. 2015) (holding that "Defendant's conduct of accepting the terms of service is sufficient to constitute consent to personal jurisdiction in California"). C.R. also purposefully availed himself of the privileges of conducting activities and doing business in this District thereby invoking the benefits and protections of this State's laws, by entering into contractual agreements with Epic in this State, and repeatedly accessing Epic's servers, which are located in this District. (D.E. 1 at ¶ 9.)

Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and 1400(a) because this is a district in which a substantial part of the events giving rise to Epic's claims occurred, in which

C.R. committed acts of copyright infringement, and/or where Epic's injuries were suffered. (D.E. 1 at ¶ 10); *see Sweepmasters Prof'l Chimney Servs., LLC*, 2017 WL 3927626, at *2 (holding that venue was proper because "a substantial part of the alleged acts of infringement occurred in this District."). Further, venue is proper in this Court because C.R. consented to venue in this District. (D.E. 1 at ¶¶ 10, 29-30, 41-42.)

The Rules provide that "default judgment may be entered against a minor only if represented by a general guardian . . . who has appeared." Fed. R. Civ. P. 55(b)(2). This requirement has been met. Ms. Rogers, the general guardian of C.R., has held herself out as C.R.'s representative and appeared in this case by sending the November 15 Letter to this Court's Clerk (D.E. 6). *See Doe ex rel. Sisco v. Weed Union Elementary Sch. Dist.*, No. 2:13-CV-01145-GEB, 2013 WL 2666024, at *4 (E.D. Cal. June 12, 2013) (holding that a parent is a general guardian under the Federal Rules of Civil Procedure through whom a minor can sue or defend); *see also Seibels, Bruce & Co. v. Nicke*, 168 F.R.D. 542 at 544 (M.D.N.C. 1996) (holding that, in considering a motion for default judgment, a court need not appoint a representative for a minor if the minor's parent had been served).

Aside from the letter, neither C.R. nor his mother appeared or responded to the Complaint, (D.E. 10), and neither made any attempt to contact Epic or counsel for Epic. Both C.R. and his Mother have ignored both of the requirements this Court set out in its July 12 Order. Defendant neither answered Epic's Complaint nor filed a "proper notice of appearance in accordance with the Local Rules" as mandated by the Order. (D.E. 22 at 5.) Both Epic and this Court expended significant resources and took extraordinary efforts to locate and serve C.R. and his mother to no avail.

"Defendant['s] recalcitrance should not delay Plaintiff['s] entitlement to relief . . ." *EMI*

Case 5:17-cv-00534-H   Document 26   Filed 09/24/18   Page 11 of 23

*Apr. Music Inc. v. Rodriguez*, 691 F. Supp. 2d 632, 634 (M.D.N.C. 2010) (granting plaintiffs'

motion for default judgment and permanently enjoining from further copyright infringement of

the plaintiffs' protected works). Likewise, here, given C.R.'s and Ms. Rogers' failure to answer

Plaintiff's allegations of: (i) copyright infringement in violation of the Copyright Act, 17 U.S.C.

§§ 106 and 501, *et seq.*; (ii) contributory copyright infringement in violation of the Copyright

Act, §§ 106 and 501, *et seq.*; (iii) breach of contract in violation of North Carolina law; and (iv)

intentional interference with contractual relations in violation of North Carolina law, Plaintiff

respectfully requests that this Court enter default judgment against C.R. and award to Plaintiff a

permanent injunction as set forth in the Complaint. (D.E. 1.)

**B.     Epic's Well-Pleaded Complaint Pleads Each Element of Direct Copyright Infringement in Violation of the Copyright Act, 17 U.S.C. §§ 106 And 501, *et seq.***

The essential elements of a claim for direct copyright infringement under the Copyright

Act are:

> (1) the asserted work is an original work of authorship and copyrightable subject matter;
> (2) the plaintiff owns or has exclusive rights to all right, title, and interest in the work;
> (3) the defendant's actions infringe plaintiff's copyrights in the asserted work by copying, reproducing, preparing derivative works from, and/or displaying the asserted work publicly without plaintiff's permission;
> (4) the defendant's copies, reproductions, derivative works, and displays are identical and/or substantially similar to plaintiff's.

*See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002).

Each one of these elements is established in Plaintiff's well-pleaded Complaint. Epic

alleged that it owns the copyrights in Fortnite's computer code. (D.E. 1 at ¶¶ 21-22, 80-81; *id.* at

Exh. A [D.E. 1-1]) (showing Epic's U.S. copyright registrations in the Fortnite code); *see*

*Nelson-Salabes, Inc.*, 284 F.3d at 513 (holding that proof of plaintiff's copyright registration certificates are sufficient to meet the first two elements of the test).

Epic also alleged that C.R. prepared derivative works of Fortnite without Epic's authorization. (D.E. 1 at ¶¶ 65, 70-78.) As stated in the Complaint:

> the cheat software used by Defendant (and those whom Defendant induces to use such software) improperly injects unauthorized code into the active memory of the game as it runs. . . . This unauthorized **modification of the game's code as it runs** on the cheater's computer **and of the code that is sent back to Epic's servers materially changes both the game's code and the audio visual aspects of the game generated by the code.** These **changes create a different version of the Fortnite game** than the Fortnite game that is generated by Epic's copyright protected software.

(D.E. 1 at ¶¶ 70-72) (emphasis added); (*see also id.* at ¶¶ 4, 83.) *See also* 17 U.S.C. § 106(2) (listing the right "to prepare derivative works based upon the copyrighted work" as one of the copyright holder's exclusive rights); 17 U.S.C. § 101 (defining "derivative work" as "a work based upon one or more preexisting works . . . [in any] form in which a work may be recast, transformed, or adapted.") Accordingly, Epic has alleged that C.R.'s use of the cheat software creates unauthorized derivative works based on Fortnite in violation of the Copyright Act. (D.E. 1 at ¶¶ 79-95.)

Epic also alleged that C.R. publicly displayed and/or publicly performed the unauthorized derivative works, which include Epic's underlying copyrighted content, in further violation of the Copyright Act. (*Id.* at ¶ 85.) *See* 17 U.S.C. §§ 106(4)-(5) (listing, in the case of audiovisual works, the rights to perform and display the copyrighted work publicly as two of the copyright holder's exclusive rights); 17 U.S.C. § 101 ("To perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . to the public, by

means of any device or process . . .").  C.R.'s demonstration of the use of the cheats in at least

the First and Third YouTube Videos constitutes the unauthorized public display and/or public

performance of the unauthorized derivative works, which infringes Epic's copyrights. (D.E. 1 at

¶¶ 74-88.)

Epic also alleged that the unauthorized derivative work prepared and publicly displayed

and/or publicly performed by C.R. is substantially similar to Fortnite.  (*Id.* at ¶¶ 4-6, 70-72, 83.)

As described in the Complaint, C.R.'s cheating creates an unauthorized version of Fortnite in

which the copyright-protected code is modified by other code injected by C.R., which materially

alters the game's code and the audio visual work the code creates and arms cheaters with

valuable skills that other players, who are not cheating, do not have.  (*Id.* at ¶¶ 4-6, 52.)

Epic further alleged that C.R. had access to Fortnite and that he used Epic's services,

including Fortnite.  (*Id.* at ¶¶ 7, 55, 82) (alleging, *inter alia*, that C.R. has been banned from

playing Fortnite at least 14 times and continues to play using other accounts created using false

names).  Accordingly, because Epic's Complaint establishes all of the elements of a claim for

direct copyright infringement, and because these allegations are deemed admitted upon C.R.'s

default, Epic's Motion should be granted.  (*Id.* at ¶¶ 79-95); *see also Joe Hand Promotions, Inc.*

*v. Blackburn,* No. 7:11-CV-276-BO, 2013 WL 4068165, at *1 (E.D.N.C. Aug. 12, 2013) ("In

granting default judgment, well-pleaded factual allegations are sufficient to establish a

defendant's liability.")

**C.      Epic's Well-Pleaded Complaint Pleads Each Element of Contributory**
**Copyright Infringement in Violation Of The Copyright Act, 17 U.S.C. §§ 106**
**and 501,** *et seq.*

The essential elements of a claim for contributory copyright infringement are that the

defendant (1) has knowledge of a third party's infringing activity; and (2) induces, causes, or

materially contributes to the infringing conduct. *See Thomson v. HMC Grp.*, No. CV1303273DMGVBKX, 2014 WL 12589313, at *5 (C.D. Cal. July 25, 2014).

Epic's well-pleaded Complaint establishes the first element by alleging that C.R. had constructive *and* actual knowledge that other cheaters were engaging in the same infringing activity as C.R. (D.E. 1 at ¶¶ 98, 100-101, 103-104.) Epic alleged the second element by alleging that C.R. published the First and Third Videos, which demonstrated how the cheat works, and provided instructions for use of the cheat and the Internet location of the cheat. Epic alleged that C.R.'s conduct was "an effort to induce others to buy the cheats he sells so that they too can cheat at Fortnite" and, thus, infringe Epic's copyrights in exactly the same way C.R. has infringed. (*Id.* at ¶¶ 7, 70, 100, 102.) Further, Epic alleged that, on information and belief, Defendant "obtains some financial benefit or value in consideration for his video postings and/or the sale of the cheat he promotes and demonstrates in the First and Third Videos." (*Id.* at 104.)

The Complaint also alleges that C.R.'s activities directly infringed Epic's Copyrights. (*See, supra*, Section II(B).) Because Epic's Complaint has established all of the elements of a claim for contributory copyright infringement, and because these allegations are deemed admitted upon B.B.'s default, Epic's Motion should be granted. (*Id.* at ¶¶ 96-113); *see also Joe Hand Promotions, Inc.,* No. 7:11-CV-276-BO, 2013 WL 4068165, at *1.

### D.     Epic's Well-Pleaded Complaint Establishes a Breach of Contract Claim

Epic's Complaint established a claim for breach of contract because it alleges (1) the existence of a valid contract; and (2) subsequent breach of the contract's terms. *See Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015). Epic has established the first element as it has alleged that valid, enforceable contracts exist between Epic and C.R. under the Terms and the EULA because Defendant agreed to be bound by the terms of

each of those agreements by affirmative agreement, creating an account with Epic, and repeatedly using, downloading, playing and/or accessing Fortnite. (D.E. 1 at ¶¶ 23, 38, 115-121.) Further, Epic alleged that Defendant agreed to be bound by the terms of each of those agreements not only once, but 14 times. (D.E. 1 at ¶¶ 115-121.) Accordingly, valid, enforceable contracts existed between C.R. and Epic in connection with the Terms and the EULA.[3] (*Id.* at ¶¶ 114-123.)

Epic has also adequately pleaded the second element of breach of contract. C.R.'s activities as set out in the Complaint– including the creation of unauthorized derivative works based on Fortnite, displaying and performing Fortnite in an unauthorized way, and distributing and using unauthorized software programs to gain an advantage in Fortnite – constitute clear breaches of the Terms and the EULA. (*Id.* at ¶¶ 5-7, 37, 49, 54, 58, 73, 122.) Accordingly, the allegations of the Complaint establish a claim for breach of contract. (*Id.* at ¶¶ 114-123.)

### E. Epic's Well-Pleaded Complaint Establishes a Claim of Intentional Interference With Contractual Relations

The essential elements of a claim for intentional interference with contractual relations are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person;
> (2) the defendant knows of the contract;
> (3) the defendant, without justification, intentionally induces the third person not to perform the contract;
> (4) resulting in actual damage to the plaintiff.

*Red Arrow v. Pine Lake Preparatory, Inc. Bd. of Directors*, 226 N.C. App. 431, 741 S.E.2d 511 (2013).

---

[3] The November 15 Letter, construed as a motion to dismiss, appeared to assert the infancy defense. Epic responded to this apparent argument in its Response (D.E. 20 at 13-15). By denying that motion to dismiss, this Court has already held that the infancy defense is unavailable to C.R. (*See* D.E. 23.)

Epic alleged that valid and enforceable contracts exist between Epic and users of its services, including C.R. (*See also* D.E. 1 at ¶¶ 124-129.)  Epic further alleged that C.R. knew of the terms of those agreements and knew that other users of Epic's services are required to agree to abide by the Terms and the EULA because C.R. entered into exactly the same contracts multiple times. (*Id.* at ¶ 130.).

The Terms and the EULA explicitly list activities users of Epic's services are prohibited from engaging.  Epic alleged that C.R.'s intentional, active, and willful encouragement and inducement of users of Fortnite to use the cheats, through his public posting and demonstration of the cheats as described in Sections I(C) constitutes intentional interference with contracts formed between Epic and its users.  (*Id.* at ¶¶ 131-132.)  Epic also alleged that C.R. engaged in this misconduct without justification.  (*Id.* at ¶ 133.)  Finally, Epic alleged that C.R.'s intentional inducement of others resulted in actual damage to Epic, e.g., that Epic suffered a loss of goodwill among users of Epic's services, decreased profits, and lost profits from users whose accounts Epic terminated for violations of the Terms and the EULA.  (*Id.* at ¶¶ 134-136.) In light of the above, Epic's Complaint pleads all the elements required in a claim for intentional interference with contractual relations, and because these allegations are to be admitted, Epic's Motion should be granted. (*Id.* at ¶¶ 124-136); *see also Joe Hand Promotions, Inc.,* No. 7:11-CV-276-BO, 2013 WL 4068165, at *1.

### F.    Epic is Entitled to Permanent Injunctive Relief

The Copyright Act provides that a court may "grant . . . final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  The DMCA provides, using similar language, that a court may "grant . . . permanent injunctions on such terms as it may deem reasonable to prevent or restrain a violation . . ." 17 U.S.C. §

1203(b). A permanent injunction "is appropriate where the nature of the infringement prevents an adequate remedy at law, and . . . where a threat of continuing infringement exists." *Id.* Courts have the authority to grant injunctions in default judgment actions involving copyright infringement. *See, e.g., Arista Records LLC v. Gaines*, 635 F. Supp. 2d 414, 417 (E.D.N.C. 2009) (granting plaintiff's motion for default judgment and for permanent injunction in copyright infringement case); *Nexon Am. Inc. v. Kumar,* No. 2:11-CV-06991-ODW, 2012 WL 1116328, at *7 (C.D. Cal. Apr. 3, 2012) (granting plaintiff's motion for default judgment and for permanent injunction in a case involving a violation of the DMCA.)

Epic respectfully requests that this Court issue a permanent injunction enjoining C.R. from continuing to infringe any of Epic's copyrighted works and/or induce or materially contribute to the direct infringement of Epic's copyrighted works by others; from violating the Terms; from violating the EULA; and/or from intentionally interfering with Epic's contractual relations with other parties to those agreements. Epic further requests that the Court order destruction of all infringing videos and copies of cheats or hacks in Defendant's possession, custody, or control that can be used to infringe Epic's copyrights in Fortnite so as to restrain Defendant's continued violations of Epic's copyrights in Fortnite.

In order to obtain a permanent injunction, Epic must prove that "(1) it suffered an irreparable injury; (2) the remedies available at law, such as monetary damages, are inadequate compensation for that injury; (3) considering the balance of hardships between the parties, equitable relief is warranted; and (4) the public interests would not be disserved by a permanent injunction." *Christopher Phelps & Assocs, LLC v. Galloway*, 492 F3d 532, 543 (4th Cir. 2007) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 1840 (2006)), considering *eBay* factors in copyright infringement case and noting that irreparable injury often

occurs when owner of intellectual property is deprived of ownership rights). Here, all four of the *eBay* factors weigh in favor of granting a permanent injunction.

1.  Epic Has Suffered and Will Continue To Suffer Irreparable Injury

Epic, the owner of the copyrights in Fortnite, has experienced immense success with the game, and has developed substantial and valuable goodwill in Fortnite. (D.E. 1 at ¶¶ 13-18; Second Decl. of Thomas at ¶ 3.) C.R.'s past actions cannot be "undone, erased, or destroyed" and so they, along with his current acts, represent an ongoing threat to the integrity of the game and its appeal to players and those who watch people play and broadcast their gameplay (i.e. streamers.) Accordingly, they "represent[] the very essence of irreparability." *See Controversy Music v. Mason,* No. 5:09-CV-488-BR, 2010 WL 2607229, at *4 (E.D.N.C. June 24, 2010) (granting plaintiff's motion for default judgment and permanent injunction in connection with a copyright infringement suit where defendant engaged in unauthorized public performance of plaintiff's works). Moreover, the Fourth Circuit has held that "[i]rreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights." *Id.* (citing *Christopher Phelps & Assocs., LLC*, 492 F.3d at 544).

C.R. has distributed and continues to promote a cheat that could be shared in perpetuity, causing Epic to continue to suffer irreparable harm. (D.E. 1 at ¶¶ 50-78.) C.R. continues to use, and post videos and tweets that promote, cheats that infringe Epic's copyrights. Given this and his recent statements that he plans to upload all of his past infringing material, C.R. has made clear that unless he is enjoined, he will continue engaging in the complained-of conduct.

This issue of continuing infringement is more acute because Epic's filing of the instant action was necessitated by Defendant's submission of a DMCA counter notice that, under the statute, gave Epic between ten and 14 days to file this action against C.R. seeking to restrain him

from engaging in infringing activity or face the restoration of the infringing content by YouTube. 17 U.S.C. § 512(g)(2)(C); (*Id.* at ¶¶ 3, 86, 93, 102, 111.) Accordingly, this factor weighs in favor of granting the permanent injunction.

### 2. Monetary Damages are Inadequate to Compensate for Damage to Plaintiff's Reputation

Any monetary damages awarded to Epic would only compensate Epic for the infringing and improper activity in which C.R. already engaged. No monetary damages would be awarded for any *future* infringing and improper activity resulting from others' continued use of the cheats propagated by C.R. Accordingly, monetary damages would not compensate Epic. *See UMG Recordings, Inc. v. Blake*, No. 506-CV-00120-BR, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007) (granting plaintiff's motion for permanent injunction and holding that monetary damages would "only compensate for Defendant's one-time infringement of each [music] recording, and not for inevitable future transfers"); *see also Nexon Am. Inc.*, 2012 WL 1116328, at *7 (granting plaintiff's request for permanent injunction for violation of the Copyright Act and the DMCA and holding that monetary damages would be insufficient to "prevent or deter the adverse, long-term effect" of Defendant's actions).

Furthermore, given that C.R.'s actions demonstrate that he is continuing to infringe, induce others to cheat, and breach the Terms and the EULA, a permanent injunction is required as "a substantial amount of speculation and guesswork [would render] the calculation of future damages and profits difficult or impossible." *Controversy Music*, No. 5:09-CV-488-BR, 2010 WL 2607229, at *4 (internal citations and quotations omitted). In light of the above, this factor weighs in favor of finding that this element has been satisfied.

### 3. The Balance of Hardships Weighs In Favor of Injunctive Relief

The balance of hardships unquestionably weighs in favor of granting the injunction. The

permanent injunction merely prevents C.R. violating the law. It does not constitute a hardship at all. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04CV00977, 2007 WL 4262725, at *3 (M.D.N.C. Nov. 30, 2007). The hardship lies with Epic as C.R. has propagated a cheat (and continues to make such cheats available) that could be shared in perpetuity and will cause damage to Epic's reputation, market share, and relationship with its current and future customers. *UMG Recordings, Inc.*, No. 506-CV-00120-BR, 2007 WL 1853956, at *3 (granting plaintiff's permanent injunction and holding that "a distinct hardship rests with Plaintiffs" given defendant's ability to "replicate [Plaintiffs'] recordings into infinity"); *Nexon Am. Inc.*, 2012 WL 1116328, at *7 (granting plaintiff's motion for a permanent injunction for violation of the Copyright Act and the DMCA and holding that the injunction "imposes little-if any- hardship on Defendants"). Accordingly, this factor weighs in favor of granting a permanent injunction.

### 4. Public Interests Will Be Served by Entry of Permanent Injunction

Courts have held that "there is a substantial public interest in preserving a copyright holder's exclusive rights." *Id.* Further, no public interest will be served by enjoining C.R. from continuing this activity. *Controversy Music*, No. 5:09-CV-488-BR, 2010 WL 2607229, at *4.

In fact, the opposite is true. The public interest will be harmed should C.R.'s actions not be enjoined. This would send a message to other hackers and cheaters that their unlawful conduct is permitted. As described in the attached article entitled "5 Examples of How Cheating in Fortnite Gets You Infected," Fortnite has become so popular that technology media outlets feel compelled to publish articles warning the public about the ways in which bad actors can use malware, "disguised as Fortnite hacks, cheats, or other tools," to steal an individual's personal information or otherwise compromise the individual's computer or other device. (*See* Second Decl. of Thomas at ¶ 13, Exh. 7.) Accordingly, it is in the public interest to grant Epic's

PPAB 4441424v2 Case 5:17-cv-00534-H   Document 26   Filed 09/24/18   Page 21 of 23

injunction in order to preserve the environment of fair play Epic strives to create for users, and to stop the promotion and propagation of cheats.

### III.   <u>CONCLUSION</u>

For all of the foregoing reasons, Epic respectfully requests that this Court grant its motion for default judgment and award Epic a permanent injunction against C.R.

Respectfully submitted, this the <u>24th</u> day of September, 2018.

/s/ Christopher M. Thomas
Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Tasneem D. Delphry
N.C. State Bar No. 47697
tasneemdelphry@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Post Office Box 389
Raleigh, North Carolina 27602-0389
Telephone:  (919) 832-4626
Facsimile:   (919) 834-4564


*Attorneys for Plaintiff*
*Epic Games, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT** was electronically filed this day with the Clerk of Court using the CM/ECF system and that a true and accurate copy of it was sent to all parties to this cause by depositing the original and/or copy hereof, postage pre-paid, in the United States mail, addressed as follows:

C.R.
c/o Lauren Rogers
501 West Ave.
New Castle, DE 19720

and

C.R.
c/o Lauren Rogers
5 Vireo Circle
Newark, DE 19711

This the 24th day of September 2018.

/s/ Christopher M. Thomas
Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Tasneem D. Delphry
N.C. State Bar No. 47697
tasneemdelphry@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Post Office Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 832-4626
Facsimile: (919) 834-4564

*Attorneys for Plaintiff*
*Epic Games, Inc.*